IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | |
|---|---|
| Edward B. Mitchell, | ) Civil Action No. 2:11-2028-RMG-BM |
| Plaintiff, | ) |
| | ) |
| v. | ) **REPORT AND RECOMMENDATION** |
| | ) |
| Medical University Hospital Authority, | ) |
| Defendant. | ) |

This action has been filed by the Plaintiff, a former employee of the Defendant Medical University Hospital Authority, asserting various claims for employment discrimination against the Defendant. The Defendant filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on January 22, 2013. After receiving an extension of time, Plaintiff filed a memorandum in opposition to the Defendant's motion on March 8, 2013, following which the Defendant filed a reply memorandum on March 28, 2013. The Defendant's motion is now before the Court for disposition.[1]

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The Defendant has filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.



1

## Background and Evidence[2]

Plaintiff, an African American male over the age of forty, was hired by the Defendant as a temporary Registered Nurse (R. N. II) on the Defendant's Neurology/Neurosurgery Floor in December 2007. At that time, the Neurology/Neurosurgery Floor was commonly known as "7 East". Plaintiff's Deposition, p. 65. Plaintiff's direct supervisor was Effie Amerson, the Nurse Manager for 7 East. Id., pp. 64-65. Amerson subsequently retired, and was replaced in March 2008 by Ramona Smith (white). Smith Deposition, p. 7.

In April 2008, Plaintiff applied for a permanent position. Smith was supportive of his application, and Plaintiff became a permanent employee that same month. Plaintiff's Deposition, pp. 77, 92. Plaintiff testified that he was the only black male registered nurse working on the Unit, which by that time had moved up two floors and was now known as "9 West". Plaintiff's Deposition, pp.111-113. From that period of time through September 2008, Plaintiff neither had complaints nor made complaints about either Smith or Smith's direct supervisor, June Darby (white), relating to his race, gender, or age. Plaintiff's Deposition, pp. 91-95.

In September 2008, Smith asked Plaintiff to speak at a meeting of a nursing sorority. Plaintiff's Deposition, pp. 86-87. Plaintiff testified that Smith wanted him to speak because he is an African American, and during his speech Plaintiff talked about how he felt as an African American and that it would "be nice to recruit more black males to the hospital . . . .". Plaintiff's Deposition, pp. 83, 87-88. Plaintiff testified that his speech was well received and that he received no negative feedback. Plaintiff's Deposition, p. 88. However, Plaintiff testified that following his speech at the

---

[2]The facts and evidence are considered and discussed herein in the light most favorable to the Plaintiff, the party opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

2

sorority meeting, he perceived a change in his relationship with Smith, in particular that he felt like he was "experiencing very hard work assignments". Plaintiff's Deposition, p. 102. Plaintiff was also required to perform a "write up" after a discrepancy was found with respect to the drug count on the Accudose machine, from which drugs are dispensed. Plaintiff's Deposition, pp. 93-94, 97-100. Nevertheless, when Plaintiff was asked at his deposition whether any actions or events occurred between October 3, 2008 and January 1, 2009 that Plaintiff attributed to his race, gender, or age, Plaintiff testified that there were none. Plaintiff's Deposition, pp. 120-121.

The auditing and review of patient records was an ongoing continual process at MUHA, although Plaintiff was not really familiar with how that process worked. Plaintiff's Deposition, pp. 136-138. Sometime in mid-January 2009, Plaintiff was informed by co-workers that Teresa Miller and Stacy Simmons, two white female "charge nurses", were scrutinizing or auditing his patient records. Plaintiff's Deposition, pp. 125-128.[3] Plaintiff asked Smith about this activity, and told her he wanted it to stop. Smith told Plaintiff that she would talk to "the girls" and handle it. Plaintiff's Deposition, pp. 132-133. Although this evidence clearly reflects that Plaintiff was unhappy about being audited, he did not assert in his administrative charge documents that he had been subjected to any discriminatory or retaliatory conduct for purposes of his civil rights employment claim prior to February 4, 2009. See Defendant's Exhibits E, F, G and H. However, this changed on February 4, 2009, when Plaintiff met with Darby (Smith's Supervisor) to complain that he was still be audited, and that this had upset his wife and daughter. Plaintiff's Deposition, pp.



---

[3]Charge nurses are nurses assigned to manage the activities of nurses and other hospital staff on a given unit. They handle any problems that come up, make assignments, and check on staff during the day, and report back to Smith if there are any issues that need to be addressed. Smith Deposition, p. 14.

3

141-144.

During this meeting, Plaintiff told Darby that his daughter was upset because the charge nurses, as well as the "night co-workers", were sorting through his records. Plaintiff also complained that he had not been evaluated. Plaintiff testified that Darby did not seem to be interested in what he was saying and that when Plaintiff told her he wanted to be transferred, she said she would get back with Smith. Plaintiff's Deposition, pp. 145-146. Plaintiff testified that he also told Darby that he was being "disrespected" on the floor by "these young white girls" because he was an older black gentlemen, and that this was not professional. Plaintiff specifically identified Miller and Simmons as the "young white girls" he was referring to. Plaintiff's Deposition, pp. 147-149. Plaintiff subsequently added two new nurses, Juliet McDonald and someone named "Durant", as being people who were disrespecting him. Plaintiff's Deposition, p. 150. Specifically, Plaintiff complained that he did not like the way Miller talked to him, that she did not communicate with him, and that she was auditing his files. Plaintiff's Deposition, pp. 151-152. Plaintiff complained that Simmons was "foul-mouthed" to both nurses and patients, that "most of the time" she did not assist him if asked, and that she was just "smart-mouthed". Plaintiff's Deposition, p. 152. However, with respect to the two new nurses, Plaintiff confirmed that, as of his meeting with Darby on February 4, neither Durant or McDonald had done anything to disrespect him. Plaintiff's Deposition, p. 153. Plaintiff also confirmed that, prior to February 4, Darby, Smith, Simmons and Miller had never made any statements or comments to him about his race, his age, or his gender. Plaintiff's Deposition, pp. 153-154.

From February 4 through April 17, 2009, no actions or events occurred that Plaintiff attributed to his race, gender, age, or as a result of any of the complaints he had made to Darby on



4

February 4, 2009. <u>Plaintiff's Deposition</u>, pp. 157-158. However, on April 17, 2009, Plaintiff was asked by Darby to come to her office, where Tom Brown, the Defendant's Controlled Substance Investigator, was waiting to see him. <u>Plaintiff's Deposition</u>, pp. 159-160. Brown had received a report from Smith that the Defendant had had a discrepancy in the Oxycodone drug count, and that she was concerned that Plaintiff or another nurse might be diverting some controlled substances. <u>Brown Deposition</u>, pp. 16-17. Brown testified that he pulled the records on the other nurse and did not find anything, but that with respect to Plaintiff's records, there were "several errors in there" and a "quantity of drugs missing", and Brown wanted to meet with the Plaintiff to discuss these discrepancies. <u>Brown Deposition</u>, pp. 17, 19-20. Plaintiff asked Brown if he could have a witness present during this meeting, and was told no. <u>Plaintiff's Deposition</u>, p. 160. Plaintiff testified that Brown then proceeded to ask him about certain drug discrepancies, in particular with respect to Oxycodone and Morphine, and that he [Plaintiff] denied being responsible for any drug discrepancies. <u>Plaintiff's Deposition</u>, pp. 161-162; <u>see</u> <u>also</u> <u>Brown Deposition</u>, pp. 17-24. Brown also asked Plaintiff if he would submit to a drug test, and Plaintiff agreed. <u>Plaintiff's Deposition</u>, pp. 164-165; <u>Brown Deposition</u>, pp. 25-26.

Plaintiff testified that during this process he made the comment "you know, you white guys, y'all know this is discrimination, retaliating". <u>Plaintiff's Deposition</u>, p. 167. Plaintiff testified that he then told Darby: "you know I came to you two months ago, just two months ago, you know this is about race. You discriminated, you angry, you didn't help me at all." <u>Id</u>. Plaintiff testified that, after he gave a urine sample, he said something about getting back to work, but Darby told him he had "documentational problems and that will not happen." Plaintiff testified that he was then escorted off the premises. <u>Plaintiff's Deposition</u>, pp. 168-169.



5

Plaintiff's drug test came back negative, and he returned to work on April 23, 2009. Plaintiff's Deposition, pp. 182-184. With respect to the work days he had missed, Plaintiff was retroactively suspended those days for the errors related to the administration of medication. Defendant's Exhibit K; see Defendant's Exhibit W, Section G; Plaintiff's Exhibit 2. Plaintiff also received a reprimand for an incident of insubordination which had occurred on April 3, 2009, as well as for attendance/time-clock work violations. Defendant's Exhibits L and M; see also Defendant's Exhibit W, Section G; Plaintiff's Exhibits 3 and 4. Plaintiff did not file a grievance with respect to these employment actions, but testified that he did call Eric Frisch, the Defendant's Employee Relations Manager, and asked if the Defendant had an EEO department, and was told "no". Plaintiff's Deposition, pp. 188-192.

Plaintiff testified that he became ill as a result of everything that was happening to him, and immediately went out on FMLA[4] leave. Plaintiff's Deposition, p. 198; see also Plaintiff's Exhibit 5; Defendant's Exhibit R. Plaintiff testified that while he was out on FMLA leave, Smith and Darby had him call in every day, and that Smith would also call him and "leave smart remarks on my telephone, upset[ing] my whole family". Plaintiff's Deposition, pp. 199-200. Plaintiff alleges that Smith as well as Stacy Simmons would call him telling him he needed to get back to work or asking when would he be showing up to work. Plaintiff testified that he believed the purpose of these calls was to interfere with his FMLA rights. Plaintiff's Deposition, pp. 201-203.

On or about May 2, 2009, while he was out on FMLA leave, Plaintiff submitted an initial inquiry questionnaire to the South Carolina Human Affairs Commission (SCHAC), in which he complained that he had been discriminated against on the basis of his race, sex, and age when he



------

[4]Family and Medical Leave Act.

6

was denied a transfer on February 4, 2009, and when he was disciplined and suspended on April 17, 2009.  See Defendant's Exhibit H.  Plaintiff provided a "statement of facts" with attached exhibits to SCHAC a few days later.  See Defendant's Exhibit N.  Plaintiff also called SCHAC on or about May 8, 2009 and spoke with Henley Ellis.  Plaintiff told Ellis that he had previously filed a complaint of discrimination with St. Francis Hospital about his work there,[5] that his supervisors at MUHA were "very close with people over at St. Francis" and that his supervisors had therefore been made aware of his complaint against St. Francis, and that Plaintiff believed they were retaliating against him because of his having filed a complaint about his working conditions at St. Francis.  Plaintiff conceded at his deposition, however, that this was just speculation.  Plaintiff's Deposition, pp. 211-214.

Thereafter, on or about May 12, 2009, Plaintiff filed a formal charge of discrimination with SCHAC.  See Defendant's Exhibit E.  In this document, Plaintiff alleged that he was being discriminated against by the Defendant on the basis of his race, sex, and age, and that he had also been retaliated against.  Plaintiff then also called Sabra Slaughter, Chief of Staff to the President of the Medical University of South Carolina (MUSC), and told him that he [Plaintiff] was being discriminated against and that he was being subjected to unlawful retaliation.  Plaintiff testified that Slaughter told Plaintiff that he would check to see if it would possible for Plaintiff to be transferred.  Plaintiff's Deposition, pp. 220-221.  A few days later, the Defendant received a notification letter from SCHAC that Plaintiff had filed charge of discrimination.  See Defendant's Exhibit O.

During this period of time, Plaintiff remained out of work on FMLA leave.  On or

---

[5]Plaintiff was apparently working part-time at St. Francis while also being employed by the Defendant.  Plaintiff's Deposition, pp. 212-213.



about June 9, 2009, Plaintiff spoke with Eric Frisch when he encountered Frisch in a parking lot under the building where Frisch worked. Plaintiff testified that he asked Frisch if Frisch could help him, and whether he could be transferred "off the floor" because he was being discriminated against. Plaintiff testified that during the course of their conversation, Frisch referred to Plaintiff as "son", to which Plaintiff took offense. Plaintiff testified at his deposition that when he indicated they were done talking, Frisch said to him: "You know, back in the day, you would have a loop around your neck". (R.pp. 240-241).[6] Following this meeting, Frisch sent the Plaintiff a letter, dated that same date, wherein Frisch advised Plaintiff what he needed to do to obtain a transfer to a new department. See Defendant's Exhibit P.

The following day, June 10, 2009, Plaintiff submitted a letter of resignation to the Defendant with an effective date of July 1, 2009. See Plaintiff's Exhibit 7. Plaintiff then returned to work on June 13, 2009, after he had been cleared to return to work by his physician. See Defendant's Exhibit R; Plaintiff's Exhibit 5. By letter dated June 18, 2009, Smith accepted Plaintiff's resignation. See Defendant's Exhibit S; Plaintiff's Exhibit 8. On or about June 20, 2009, Plaintiff left a letter in Smith's "box" in which he attempted to rescind his resignation; see Defendant's Exhibit T; Plaintiff's Exhibit 9; but in a response dated June 22, 2009, Smith advised Plaintiff that his resignation had been accepted. See Defendant's Exhibit U; Plaintiff's Exhibit 10. Plaintiff's last day of employment was June 28, 2009, and Plaintiff thereafter filed additional charges of discrimination with SCHAC on November 30, 2009 and December 2, 2009. See Defendant's

---

[6]Plaintiff acknowledged during his deposition that, prior to alleging that this event happened as part of the filing of this lawsuit, he had never claimed that Frisch had ever made any such comment to SCHAC or to any other entity Plaintiff was complaining to, including in either of the two charges of discrimination Plaintiff subsequently filed with SCHAC in November and December 2009. Plaintiff's Deposition, pp. 239, 241-242.

8

Exhibits Fand G; Plaintiff's Exhibits 11A and 11B.

In this lawsuit, Plaintiff alleges that the Defendant discriminated against him on account of his race in violation of Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e, et. seq. (First Cause of Action), on account of his sex in violation of Title VII (Second Cause of Action), on account of his race in violation of 42 U.S.C. § 1983 (Third Cause of Action), that he was unlawfully retaliated against in violation of Title VII and § 1983 (Fourth Cause of Action), that he was discriminated against on account of this age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626, et seq. (Fifth Cause of Action), and in violation of his rights under the FMLA (Sixth Cause of Action). Plaintiff seeks monetary damages, as well as certain declaratory relief. See generally, Complaint.

### Discussion

The Defendant seeks summary judgment on all of Plaintiff's claims. Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, to avoid summary judgment the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).

### I.

Although Plaintiff has asserted six separate Causes of Action in his Complaint, and



9

the Defendant has moved for summary judgment on all of his claims, in his response memorandum

Plaintiff only addresses two claims: 1) that he was treated differently than a similarly situated white

R.N. named Alan Lopez, and 2) that he was unlawfully retaliated against after engaging in protected

activity by reporting his concerns of racial animus to Darby on two occasions (February 4, 2009 and

April 17, 2009). Plaintiff did not respond to the Defendant's motion for summary judgment, and the

arguments and supporting evidence cited therein, with respect to any of his other claims and

allegations. In an email to the Court (Court Docket No. 66) dated March 19, 2013, Plaintiff's counsel

stated that Plaintiff was not withdrawing his other claims "at this time", but acknowledged that

Plaintiff was only submitting arguments in opposition to summary judgment with respect to his

claims of race discrimination and retaliation.

   In a reply memorandum filed March 28, 2013, the Defendant noted Plaintiff's failure

to respond to its motion for summary judgment except for with respect to the two claims cited

hereinabove, and argues that it is therefore entitled to summary judgment on Plaintiff's remaining

claims, citing to Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)["Once a motion for

summary judgment is properly made and supported, the opposing party has the burden of showing

that a genuine dispute exists"]; and Smith v. City of North Charleston, 401 F.Supp.2d 530, 532-533

(D.S.C. 2005)["[T]he the plain language of Rule 56(c) mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against the party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial"], quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986). Plaintiff filed no sur-reply responding to Defendant's argument that his other claims are

subject to dismissal on this basis, and Plaintiff's failure to respond to the Defendant's motion for



summary judgment with respect to these other claims makes any further pursuit of these claims by the Plaintiff problematic.

The Defendant has submitted evidence together with cites to applicable case law showing that Plaintiff's FMLA claim is barred by the Eleventh Amendment; see Coleman v. Maryland Court of Appeals, 132 S.Ct. 1327, 1332 (2012); that his age discrimination claim is barred by the Eleventh Amendment; Kimel v. Florida Board of Regents, 528 U.S. 62, 91 (2000); that his claim against the Defendant under § 1983 is barred by the Eleventh Amendment; Bellamy v. Boarders, 727 F.Supp. 247, 249 (D.S.C. 1989); and that even assuming Plaintiff has intended to assert a separate claim for hostile work environment under Title VII and possibly the ADEA[7], he has failed to submit evidence sufficient to meet the requirements for establishing such a claim. Baqir, 434 F.3d at 745-746. As Plaintiff has failed to argue against or contest these grounds for dismissal in any way, the undersigned finds that the Defendant is entitled to summary judgment on these claims. Additionally, Plaintiff has also failed to cite to any evidence to support, or to even address, the claim that he was discriminated against on the basis of his sex (other than to simply point out the genders of the various people involved in the factual allegations of his case), or to support a claim for race discrimination other than with respect to the two claims briefed in his response memorandum. See generally, Austen v. HCA Health Services of Virginia, Inc., No. 00-2359, 2001 WL 242203 at **1 (4th Cir. Mar. 12, 2001); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995), cert. denied, 516 U.S. 870 (1995) [Noting that, in part, plaintiff has the burden of showing that employees who were not members of this protected class were treated more favorably, or that there

---

[7]Whether a hostile work environment claim can be asserted as part of an ADEA claim is apparently unresolved at this time, at least in the Fourth Circuit. Baqir v. Principi, 434 F.3d 733, 746, n. 14 (4th Cir. 2006).



11

is some other evidence giving rise to an inference of unlawful discrimination]. See also Gilbert v. Penn-Wheeling Closure Corp., 917 F.Supp. 1119, 1125 (N.D.W.Va. 1996).

Therefore, the Defendant is entitled to summary judgment on all of Plaintiff's claims except for the two claims to which he has responded in his response brief, and which are discussed, infra. Hooven-Lewis, 249 F.3d at 265 ["Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists"]; Celotex Corp., 477 U.S. at 322 [Summary judgment should be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"]; Burns v. Air Liquide America, LP, 515 F.Supp. 2d 748, 759, n. 9 (S.D.Tex. 2007)[Undefended claims regarded as abandoned]; see also Eady v. Veolia Transp. Services, Inc., 609 F.Supp.2d 540, 560-561 (D.S.C. 2009)["The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action."];  accord, Ferdinand-Davenport v. Children's Guild, 742 F.Supp.2d 772, 777 (D.Md. 2010); Jones v. Family Health Ctr., Inc., 323 F.Supp.2d 681, 690 (D.S.C. 2003)[Finding that plaintiff waived claims not addressed in her opposition memorandum, even though counsel advised the court that she had not intended to abandon those claims]; Mentch v. Eastern Savings Bank, FSB, 949 F.Supp. 1236, 1247 (D.Md. 1997).

## II.

Plaintiff's remaining disparate treatment claim is a claim for race discrimination in violation of Title VII, wherein Plaintiff claims that he was treated differently than a similarly situated

white RN named Alan Lopez.[8]  Where there is no direct evidence of intentional discrimination,[9] as is the case here, a Title VII disparate treatment race discrimination claim is ordinarily considered under the proof scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). However, Plaintiff's claim can also be considered under a "mixed-motive" analysis; see Hill v. Lockheed Martin, 354 F.3d 277, 284-285 (4th Cir. 2004); Mereish v. Walker, 359 F.3d. 330, 339-340 (4th Cir. 2004); and Plaintiff has chosen to pursue his claim as a mixed-motive case. See Plaintiff's Brief, pp. 8-10.

To survive summary judgment, a Plaintiff asserting a "mixed-motive" claim must have evidence sufficient to create a genuine issue of fact that 1) the defendant took an adverse employment action against the plaintiff; and 2) plaintiff's race was a motivating factor for the employment action. Megivern v. Glacier Hills, Inc., No. 12-1330, 2013 WL 2097373, at * 16 (6th Cir. May 16, 2013); Westmoreland v. Prince George's County, Md., 876 F.Supp.2d 594, 610-611 (D.Ma. 2012). "[T]he mixed-motive framework forces Plaintiffs to prove only that a forbidden factor - notwithstanding the presence of [other] permissible factors - caused the challenged conduct." Westmoreland, 876 F.Supp.2d at 612; cf. Taylor v. Virginia Union University, 193 F.3d 219, 232 (4th Cir. 1999)["The bonus for plaintiffs able to invoke the standard of liability applicable in mixed-

---

[8]Although Lopez is identified in Plaintiff's brief as both white and male, Plaintiff's counsel states both in his response brief and in his email to the Court that Plaintiff is only pursuing this claim as a claim of race discrimination. See Plaintiff's Brief, p. 13; Court Docket No. 66.

[9]Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact without any inferences or presumptions. O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 548-549 (4th Cir. 1995), rev'd on other grounds, 517 U.S. 308 (1996);  Black's Law Dictionary, 460 (6th Ed. 1990) (citing State v. McClure, 504 S.W.2d 664, 668 (Mo.Ct.App. 1974)); see Williams v. General Motors Corp, 656 F.2d 120, 130 (5th Cir. 1981), cert. denied, 455 U.S. 943 (1982).

motive cases is that proof by the employer that it would have reached the same determination without any discriminatory animus does not allow the employer to avoid liability altogether. Rather, such proof only limits the remedies available to the plaintiff."]; Mereish, 359 F.3d. at 339-340.

Turning then to the evidence before the Court concerning this claim, the undersigned is constrained to first note that Plaintiff did not specifically reference Lopez or any comparison to Lopez in either his complaints he made to the Defendant or in any of his filings with SCHAC. See Narrative with related Exhibits and Evidence, pp. 2-8, supra; see also (Defendant's Exhibit N).[10] However, Plaintiff has submitted evidence as part of his court filings to show that Lopez was hired by the Defendant as a Registered Nurse I on September 28, 2008. This evidence also reflects that

---

[10]It is arguable that Plaintiff's argument concerning employee Alan Lopez would not even be deemed "exhausted" for purposes of pursuing in this lawsuit. However, the Defendant has not asserted failure to exhaust as a defense to this claim, and in light of the conflicting caselaw on whether Plaintiff's failure to exhaust this claim would bar consideration of this claim even in the absence of an assertion of this defense by the Defendant, the undersigned has proceeded to discuss this issue on the merits. See Enoch v. Becton, Dickinson & Co., No. 11-3551, 2012 WL 2371049 at n. 12 (D.Md. June 22, 2012), which held

> Although some recent decisions in the Fourth Circuit . . . have described the administrative exhaustion requirement as "jurisdictional," Fourth Circuit precedent is not entirely consistent on this point. See, e.g., Zografov v. V.A. Med. Ctr., 779 F2d 967 (4th Cir. 1985)(stating, in federal employee's Title VII suit, that "failure to exhaust administrative remedies is not a jurisdictional bar for federal employees seeking relief under Title VII"); accord Young v. Nat'l Ctr. for Health Servs. Research, 828 F.2d 235, 238 (4th Cir. 1987); cf. Jones v. Bock, 549 U.S. 199, 212 (2007)("[T]he ususal practice under the Federal Rules is to regard exhaustion as an affirmative defense.").

See also Simmons v. Napolitano, No. 11-0801, 2012 WL 1231969 (S.D.W.Va. Apr. 12, 2012)[Claim of failure to exhaust EEOC administrative remedies is an affirmative defense]; Monk v. Perry, No. 01-93, 2002 WL 1397018, * 2 (W.D.Va. June 13, 2002); but see Bannister v. Wal-Mart Stores East, L.P., 843 F.Supp.2d 610, 616 (E.D.N.C. Feb. 14, 2012)["Failure to exhaust administrative remedies by filing an EEOC charge serves to deprive the federal courts of subject matter jurisdiction over such claims."].

14

Lopez was removed from patient care on May 23, 2009, returned to orientation and transferred to 9 West on June 7, 2009, and thereafter received a written reprimand for work performance and critical thinking skills on August 28, 2009. Lopez was subsequently involved in two incidents regarding poor judgment, and was advised on or about September 10, 2009 that his probationary employment as a Registered Nurse I was being terminated. See Plaintiff's Exhibit 12 [Under Seal]. Lopez thereafter submitted a letter of resignation to Smith on September 11, 2009. Plaintiff's Exhibit 13. However, Lopez was then rehired by the Defendant on or about September 27, 2009, but was not placed back in 9 West. See Plaintiff's Exhibit 14. Plaintiff contends that Lopez was also given a raise of $1.20 an hour. Cf., Plaintiff's Exhibits 14 and 15.

Plaintiff argues, by contrast, that after he was questioned by Brown and Darby on April 17, 2009 regarding alleged discrepancies in documenting medication he was administering to patients, he was required to submit to a drug screening and then suspended. In addition to undergoing a suspension due to his alleged documentation errors, Plaintiff also received two additional reprimands for insubordination and attendance issues. Plaintiff Deposition, pp. 159-160, 167-168, 183-185; Plaintiff's Exhibits 2-4. Plaintiff further contends that he was provided no assistance with his repeated requests for a transfer, that Smith refused to allow him to rescind his letter of resignation, and that Smith even advised him that she would not recommend him for future employment due to his alleged performance problems. Plaintiff's Deposition, pp. 220-221, 234-235; Plaintiff's Exhibits 7-10, 16-17. Plaintiff argues that this differential treatment is sufficient evidence "for a reasonable jury to conclude, by preponderance of the evidence, that race . . . was a motivating factor" for the Defendant's employment decisions. See Hill, 354 F.3d at 284-285. However, after careful review and consideration of the arguments and evidence presented to this Court, the undersigned does not

15

find that Plaintiff's evidence with regard to the comparative treatment of RN Alan Lopez is sufficient to give rise to a genuine issue of fact as to whether Plaintiff's race was a motivating factor for the employment action(s) taken in this case. <u>Megivern</u>, 2013 WL 2097373, at * 16.

To show that race was a motivating factor in the employment decisions taken with respect to Plaintiff and Lopez, Plaintiff's evidence must be sufficient to give rise to a genuine issue of fact that a similarly situated employee outside of his protected class (Lopez) received more favorable treatment than he did. <u>Shivers v. S.C. Dept. of Corrections</u>, No. 09-3357, 2011 WL 4549261, * 7 (D.S.C. Sept. 30, 2011)[Noting that to be similarly situated employees had to have been "engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it"] (internal citations omitted); <u>Robinson v. United Parcel Services, Inc.</u>, No. 06-2601, 2007 WL 3484743 at * 4 (N.D.Ga. Nov. 14, 2007)[Proper comparator is one who is similarly situated in all relevant respects]; <u>Smith v. Sunbelt Rentals, Inc.</u>, 356 Fed.Appx. 272 at ** 6-7 (11th Cir. Dec. 10, 2009)[To survive summary judgment, Plaintiff must show that he and the alleged comparable employee are "similarly situated in all relevant respects"]. Considered in the light most favorable to the Plaintiff, the evidence is that both Lopez (white) and Plaintiff (African American) were both RNs employed by MUHA during the relevant time period. With respect to Plaintiff, the evidence shows that Smith was supportive of Plaintiff moving into his position, which became a permanent position in April 2008. Sometime thereafter, Smith required Plaintiff to write a statement regarding a medication discrepancy that had occurred on his floor, but he received no formal discipline as a result of this event. <u>Plaintiff's Deposition</u>, pp. 96-100. Lopez was then hired in September 2008, but was not at that time employed at 9 West. <u>Plaintiff's Exhibit 14</u>.



In early January 2009, Plaintiff learned that his patient records were being audited. Plaintiff acknowledged that the auditing and review of patient records was an ongoing continual process at MUHA, but still asked Smith about what was going on and told her he wanted the auditing of his patient records to stop. Smith indicated she would handle it. <u>Plaintiff's Deposition</u>, pp. 132-133, 136-138. Nevertheless, Plaintiff had no complaints relating to his race at that time. <u>Plaintiff's Deposition</u>, pp. 120-121. When Plaintiff subsequently learned that his files were still being audited, he complained to Darby (Smith's supervisor) on February 4, 2009. Plaintiff also complained that he was being "disrespected" by "young white girls" on the floor, and told Darby that he wanted to be transferred. <u>Plaintiff's Deposition</u>, pp. 145-149. Again, however, Plaintiff testified that none of the complaints he had at that time about the way he was being treated had anything to do with his race. <u>Plaintiff's Deposition</u>, pp. 151-154. Thereafter, Plaintiff continued to have no complaints about the way he was treated through April 17, 2009, when he was asked to come to Smith's office. At this meeting, Plaintiff was questioned by the Defendant's Drug Enforcement Officer (Brown) concerning several instances of unaccounted for Oxycodone capsules in his patient records, as well as an incident of Plaintiff administering the wrong dose of morphine to a seriously ill patient for an extended period of time. <u>See Defendant's Exhibit J</u> [Internal Audit Report]. Brown had been called by Smith to review the matter pursuant to Section C of the Defendant's drug policy. <u>See Defendant's Exhibit V</u>. During the meeting Plaintiff was also asked if he would take a drug test, to which Plaintiff agreed. Plaintiff was then suspended indefinitely pending the results of the drug screen and investigation. <u>Defendant's Exhibit J</u>, p. 3.

Plaintiff's drug test was negative, and he was returned to work on April 23, 2009. Plaintiff was provided a letter at that time outlining the results of Brown's investigation, and which



listed Plaintiff's involvement in nine incidents of missing medication that could not be accounted for and/or improper administering of medications. As a result of this investigation, Plaintiff's missed work days (April 17-19) were designated as a suspension without pay, and Plaintiff was advised that should he have any future performance or disciplinary violations, his employment may be terminated. Defendant's Exhibit K. Plaintiff also received formal counseling regarding his attendance/time-clock entry problems, as well as an oral reprimand for an incident of insubordination. See Plaintiff's Exhibits L and M. Plaintiff then went out on FMLA leave that same day.

By this time, Lopez had been working for the Defendant for almost a year, and no evidence has been presented of Lopez having had any performance problems. However, Lopez either misdiagnosed or failed to follow the proper standard of care with a patient on or about May 21, 2009, which resulted in his being removed from patient care. Lopez was required to "return" to orientation and was subsequently transferred from his previous work area to 9 West on or about June 7, 2009, where he would now be supervised by Smith. Meanwhile, while out on FMLA leave, Plaintiff filed a charge of discrimination with SCHAC on or about May 12, 2009. During his time out of the office Plaintiff also spoke to both Slaughter and Frisch about a possible transfer. See Plaintiff's Exhibits 16 and 17. The day after Plaintiff's receipt of Frisch's response letter on June 9, 2009, he wrote a letter to Frisch in which he stated "I am concerned that because I filed Title VII charges of discrimination against MUSC that I might be retaliated against as a consequence. Hopefully, this would not have occurred, but at this stage in my career I believe I cannot take the chance that retaliation may occur. Therefore, I hereby submit my resignation from MUSC effective July 1, 2009." Plaintiff's Exhibit 7. Plaintiff thereafter returned to work from FMLA on June 13, 2009, and by letter dated June 18, 2009, Smith accepted Plaintiff's resignation. Defendant's Exhibit S. In that



18

letter, Smith also advised Plaintiff that, based upon deficiencies noted with his performance, she could not recommend that he be considered for employment in the future "as is standard practice for employees with identified performance deficiencies". See Defendant's Exhibit S. Plaintiff thereafter attempted to rescind his resignation, which was not accepted. See Defendant's Exhibits T and U.

On August 28, 2009, Lopez received a written reprimand for his work performance and critical thinking skills. However, it is unclear whether that reprimand was for the previous work issue from May, or whether it was for something new, as no new performance deficiency is noted in the exhibit. In any event, Lopez was warned at that time that any further violation of MUHA policy or performance deficiency might result in his termination. After receiving this written reprimand and warning, Lopez was subsequently involved in an incident in which a patient who had suspected cardiac issues was transferred to a higher level of care without an IV, and was also involved with a patient who was assessed to be a high risk for falls having fallen while no protocols were in place to identify the patient as such. As a result, Lopez was notified by Smith on September 10, 2009 that he was being terminated. Plaintiff's Exhibit 12. The following day, Lopez wrote Smith a letter resigning his position as a staff RN in the neuroscience department, effective September 15, 2009. Plaintiff's Exhibit 13. The evidence reflects that Lopez was subsequently rehired on or about September 24, 2009, which was listed as a demotion/transfer from 9 West effective September 27, 2009, apparently by either a Martha Hooper or a Karen Weaver. See Plaintiff's Exhibit 14. There is no indication in the evidence what race Hoover and Weaver are, nor is there any indication who was involved in Lopez's other employment actions (prior to his transfer to 9 West) or what their races are.

This evidence does not give rise to a genuine issue of fact as to whether a similarly



19

situated person outside the Plaintiff's class received more favorable treatment. By Plaintiff's own admission, from the time of his hire in 2008 until his meeting with Smith and Brown in April 2009, Plaintiff had not experienced or been subjected to any conduct or employment actions that he attributed to racial discrimination. Plaintiff's Deposition, pp. 91-95, 120-121, 153-154, 157-158; see also Defendant's Exhibit E, F, G and H. Indeed, Plaintiff had had only one employment action during that period of time: being required to perform a "write-up" after a discrepancy was found with respect to the drug count on the Accudose machine, which was early in his tenure. Plaintiff's Deposition, pp. 93-94, 97-100. While Plaintiff clearly was unhappy about his patient files being audited in early 2009, Plaintiff conceded that this was an ongoing continual process for patient records at MUHA, and he did not assert any discriminatory motive with respect to this activity. Plaintiff's Deposition, pp. 120-121, 136-138, 153-154.

As for the events of April 2009, Plaintiff has provided no evidence to dispute Brown's testimony that Smith was concerned that either Plaintiff *or another nurse* might be diverting some controlled substances, or that after Brown pulled the records on the other nurse he did not find anything, while there were several errors and a quantity of drugs missing with respect to Plaintiff's records. Brown Deposition, pp. 16-17, 19-20. Further, while Plaintiff may not agree with the employment action taken (a three day suspension) with respect to the numerous violations found by Brown in his report, primarily involving missing quantities of drugs, he has provided no evidence to show that this sanction was inappropriate or, more importantly, that it had anything to do with his race. Defendant's Exhibit K. cf. Nichols v. Caroline County Bd. of Educ., 123 F.Supp.2d 320, 327 (D.Md. 2000)[Plaintiff's contention that supervisors subjected him to adverse employment actions "because I am who I am" insufficient to establish [discriminatory] character to their disagreements



and misunderstandings]; Boden v. U.S. Amada Ltd., 978 F.Supp. 657, 659 (E.D.N.C. 1997) [former employee's own subjective belief and conclusory statements that he had been discriminated against are not sufficient to raise reasonable inference of unlawful discrimination].

Additionally, while Plaintiff contests the incident of insubordination for which he received a reprimand, he has provided no evidence to contest that he was guilty of the attendance/time-clock work violations for which he received a reprimand, and even concedes that he did have some time management issues. See Defendant's Exhibits L and M; see also Plaintiff's Deposition, pp. 178-181, 186, 208. Again, Plaintiff has provided no evidence that any of these findings had anything whatsoever to do with his race, instead offering only his own speculation that that was the case. Cook v. CSK Transp. Corp., 988 F.2d 507, 513 (4th Cir. 1993) ["[U]nsupported allegations do not establish a prima facie case of [ ] discrimination...."]; Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) ["unsubstantiated allegations" are insufficient to defeat summary judgment]; Hawkins v. Pepsico, Inc., 203 F.3d 274, 281 (4th Cir. 2000) [affirming grant of summary judgment to the employer where the employee did not "show that...[the] problems were [racial] in nature"]; Cf. Beall v. Abbott Labs, 130 F.3d 614, 619 (4th Cir. 1997)[In considering whether a claimant was adequately performing their job, it is the perception of the decision maker which is relevant, not the self assessment of the claimant], overruled on other grounds by, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105 (2002); Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997)[inquiry centers upon the employer's beliefs, and not the employee's own perception of [her] performance]; King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003)[On a motion for summary judgment, a Plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [the Plaintiff] was meeting [the employer's] expectations."].



21

Further, there is no similarity between Lopez's conduct and Plaintiff's. Plaintiff had three incidents of *administering improper medication doses to patients in April 2009*; five documented incidents of missing medication that could not be accounted for, all but one involving missing Oxycodone capsules; as well as an incident of improper stocking of Morphine. See Defendant's Exhibit J. By contrast, Lopez had only one improper standard of care incident, in May 2009. Plaintiff's Exhibit 12. There is also no evidence that Lopez contested his conduct, while it is readily apparent that Plaintiff failed to take any responsibility for the employment infractions/deficiencies noted by Brown in his report. Defendant's Exhibit J, p. 3; Plaintiff's Exhibit 12. These two work histories are not remotely comparable. Smith, 356 Fed.Appx. 272 at ** 6-7 [To survive summary judgment, Plaintiff must show that he and the alleged comparable employee are "similarly situated in all relevant respects"]; Mahomes v. Potter, 590 F.Supp.2d 775, 784 (D.S.C. 2008) [Courts will generally conclude that employees are not appropriate comparators where the disciplinary history of the two employees is not similar]; Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)[holding that before employees can be viewed as comparable for purposes of invidious discrimination, they must have "dealt with same supervisor, [been] subject to the same standards and engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."].

For his one employment event, Lopez was removed from patient care, required to return to orientation, and issued a written reprimand. Plaintiff's Exhibit 12. For the *nine* employment events cited by Brown in his report Plaintiff received a three day suspension, he was counseled for his tardiness/attendance issues, and he received an oral reprimand for the one event of

insubordination. <u>Plaintiff's Exhibits K, L and M</u>.[11] The undersigned can discern no indication of disparate treatment or race discrimination in this evidence. <u>Mulvey v. BellSouth Telecommunications, Inc.</u>, No. 08-3547, 2010 WL 3782433, at * 10 (D.S.C. Sept. 20, 2010)[Noting that "employees with different disciplinary records will often receive different punishments for . . . misconduct based upon their past records"]; <u>see Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986) [there must be evidence on which a jury could reasonably find for the Plaintiff]; <u>Yarnevic v. Brink's Inc.</u>, 102 F.3d 753, 757-758 (4th Cir. 1996) [holding that remote inferences and conclusory allegations cannot defeat summary judgment]; <u>Boden</u>, 978 F.Supp. at 659 [former employee's own subjective belief and conclusory statements that he had been discriminated against are not sufficient to raise reasonable inference of unlawful discrimination].

The evidence further reflects that while Plaintiff was out on his FMLA leave, he approached both Slaughter and Frisch about a possible transfer, to which they gave written responses. See <u>Plaintiff's Exhibits 16 and 17</u>. However, the day following his conversation with Frisch (during which Plaintiff now asserts Frisch made a racially charged statement), Plaintiff resigned in a letter to Frisch dated June 10, 2009.[12] <u>Plaintiff's Exhibit 7</u>. Smith accepted Plaintiff's resignation, and thereafter did not accept Plaintiff's attempt to rescind his resignation. See <u>Defendant's Exhibit T and U</u>. By contrast, the Defendant actually made the affirmative decision to *terminate* Lopez's employment after he transferred a cardiac patient to a higher level of care without an IV, and was involved in a patient falling for improper protocols were not in place to prevent such an event from

---

[11]Plaintiff also refused to sign any of these employment reports.

[12]Plaintiff did not reference his conversation with Frisch in his resignation letter, or cite any comments allegedly made by Frisch as having played any part in his decision.

occurring.  Plaintiff's Exhibit 12.  Lopez then submitted a letter of resignation *after* he had already

been terminated.  Plaintiff's Exhibit 13.  Plaintiff was never terminated by the Defendant - he

resigned.  While Lopez was subsequently re-hired by the Defendant, Plaintiff has presented no

evidence to show under what circumstances he was rehired, or what the race is of the officials who

made this decision.  Rodrigues-Cuervos v. Walmart Stores, Inc., 181 F.3d 15, 21 (1st Cir. 1999)

[Plaintiff bears the burden of showing the lack of differentiating or mitigating circumstances].  In

addition, none of the documents provided by Plaintiff show that Smith was even involved in this

decision.  Cf. Defendant's Exhibit W, Section N.  Koski v. Standex, Int'l Corp., 307 F.3d 672, 678

(7th Cir. 2002)[Pertinent inquiry is whether the decision maker, as opposed to other managers, have

evaluated the aggrieved employee based upon discriminatory criteria]; Heyward v. Monroe, No. 97-

2430, 1998 WL 841494 at * 2 (4th Cir. Dec. 7, 1998)[Finding that a Plaintiff must show that the

alleged comparators are similar in all relevant respects including the same supervisors]; Smizer v.

Community Mennonite Early Learning Center, No. 10-4304, 2013 WL 1154263 at * 3 (N.D.Ill. Mar.

19, 2013)["In order to satisfy 'same supervisor' requirements Plaintiff must show, at a minimum, that

a comparator was treated more favorably by the same decision-maker who took an adverse

employment action against the Plaintiff."].

         In sum, other than his own subjective speculation and conjecture, Plaintiff has failed

to present any evidence to show that another employee who was not a member of his protected class

was treated more favorably than he was under similar circumstances.  Robinson v. United Parcel

Services, Inc., No. 06-2601, 2007 WL 3484743 at * 4 (N.D.Ga. Nov. 14, 2007)[Finding that Plaintiff

had failed to  make any showing of a similarly-situated person outside of her class having received

more favorable treatment].  Plaintiff's own subjective belief that Lopez received more favorable

24

treatment than he did because he is an African American and Lopez is white, no matter how heartfelt, is simply not sufficient by itself to create a genuine issue of fact and avoid summary judgment on his disparate treatment claim. Rucker v. Greenville Co. Sheriff Dep't., No. 10-1533, 2012 WL 951789, * 2 (D.S.C. March 20, 2012)[Conclusory allegations or denials, without more, are insufficient to preclude the granting of a summary judgment motion]. Rather, in order to proceed on this claim, Plaintiff must present *evidence* sufficient to give rise to genuine issue of fact that he and Lopez were treated disparately under similar circumstances, because he is black and Lopez is white. Westmoreland, 876 F.Supp.2d at 610-611 [Mixed-motive framework forces Plaintiffs to prove that a forbidden factor caused the challenged conduct]. Plaintiff has failed to submit any such evidence, and has therefore failed to create a genuine issue of fact. Boden, 978 F.Supp. at 659 [former employee's own subjective belief and conclusory statements that he had been discriminated against are not sufficient to raise reasonable inference of unlawful discrimination]; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) [A party opposing summary judgment "cannot create a general issue of fact through mere speculation or by the building of one inference upon another."]; Gairola v. Virginia Dep't of General Services, 753 F.2d 1281, 1288, n. 4 (4th Cir. 1985) [a case should be dismissed "...when the only evidence in support of the plaintiff's...case is based on unfounded conjecture...that [his] disfavorable treatment was the result of discrimination...."]; Hawkins, 203 F.3d at 281 [affirming the grant of summary judgment to the employer where the employee did not "show that...[his] problems were racial in nature"].

This claim should be dismissed. cf. Rudolph v. Hechinger, 884 F.Supp. 184, 188 (D.Md. 1995) ["Title VII (does) not protect against unfair business decisions - only against decisions motivated by unlawful animus"], citing Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1257 (5th

Cir. 1977); Colbert v. Tapella, 677 F.Supp. 2d 289, 295 (D.D.C. 2010)(quoting Hairsine v. James, 517 F.Supp.2d 301, 308-309 (D.D.C. 2007)["[T]he scope of review in employment discrimination cases is more narrow than [Plaintiff] wishes because federal courts are not review boards for local employment decisions . . . . A personnel decision can be silly, it can be unfair, and it can be short-sighted without being illegal; Title VII protects discriminatory decisions, not wrong ones."].

### III.

Plaintiff's remaining claim is that he was unlawfully retaliated against in violation of Title VII after engaging in protected activity when he reported his concerns of racial animus to Darby on two occasions (February 4, 2009 and April 17, 2009). Section 704(a) of Title VII, 42 U.S.C. § 2000(e)-3(a)[setting forth the standard for a retaliation claim], provides as follows:

> It shall be an unlawful practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicants for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Retaliation cases under Title VII are subject to the same requirements of proof as are applicable to McDonald Douglas disparate treatment claims. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985) overruled on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); see also Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). The employee is initially required to establish a prima facie case of retaliation by a preponderance of the evidence. Such a prima facie case consists of three elements: (1) the employee engaged in protected



26

activity; (2) the employer took adverse action against the employee; and (3) a causal connection existed between the protected activity and the adverse action. Id.; Munday v. Waste Management of North America, Inc., 126 F.3d 239, 242 (4th Cir. 1997). Once a prima facie case has been presented, the Defendant employer has the burden of producing a legitimate, non-discriminatory reason for its actions. If the employer can produce a legitimate, non-discriminatory reason for its actions, the employee must then demonstrate that the Defendant's proffered reason is pretextural. Id.

**Prima Facie case**. Considered in the light most favorable to the Plaintiff, the evidence shows that Plaintiff engaged in protected activity on February 4, 2009 by complaining to Darby that he was being "disrespected' by white co-employees because he was an older black gentleman, and when he complained to Darby and Brown on April 17, 2009 that he was being discriminated and/or retaliated against because of his race. Plaintiff's Deposition, pp. 147-149, 167. See also Plaintiff's Deposition, pp. 169-170. See Rodas v. Town of Farmington, ___ F.Supp.2d ___, 2013 WL 178152 at * 5 (W.D.N.Y. Jan. 16, 2013)["'Protected activity' includes opposing employment practices that are prohibited under Title VII (such as discrimination based on race, color, religion, sex, or national origin), or making a charge of discrimination, or participating in any investigation, proceeding, or hearing arising under Title VII."]; see also Bowman v. Holopack Intern. Corp., No. 06-1648, 2007 WL 4481130 at * 14 (D.S.C. Dec. 19, 2007)["[T]he opposition clause encompasses informal protests, such as voicing complaints to superiors or protests using an employer's grievance procedures."]. Therefore, that element of Plaintiff's prima facie case is met.

Plaintiff was subjected to an adverse employment action when he was suspended from work without pay and escorted off the premises. Cf. LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 390 (5th Cir. 2007)[Holding that a two day suspension without pay was an adverse

employment action; <u>Lybarger v. Gates</u>, No. 10-373, 2012 WL 1095915 at * 11 (N.D.Ohio Mar. 30, 2012) ["Adverse employment actions are typically marked by a 'significant change in employment status,' including 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"] (internal citations omitted). However, while it is clear that Plaintiff's suspension qualifies as an adverse employment action for purposes of his retaliation claim, Plaintiff argues that he suffered additional adverse employment actions, including the Defendant's refusal to transfer him out of 9 West, the continued auditing of his patient records, the reprimand and counseling he received for his attendant/time-clock violations and for insubordination, and his "constructive discharge" from his employment.

Plaintiff's auditing claim is without merit, as it is clear from the evidence that the auditing of his patient records began *before* Plaintiff first engaged in protected activity on February 4, 2009, and Plaintiff himself concedes that the auditing of patient records is a routine and ongoing practice at MUHA. In any event, to the extent the auditing of Plaintiff's patient files is what led to Brown's findings, that conduct by the Defendant can be considered as part of Plaintiff's suspension claim. The reprimand and oral counseling Plaintiff received for his attendance/time-clock violations and for insubordination do not qualify as "adverse employment actions" under the applicable caselaw, because they carried or imposed no employment sanction. <u>Ainsworth v. Loudon County School Bd.</u>, 851 F.Supp.2d 963, 976 (E.D.Va. 2012) ["Adverse employment actions are those that negatively impact the terms, conditions, or benefits of employment"]; <u>see generally</u>, <u>Lewis v. Forest Pharmaceuticals, Inc.</u>, 217 F.Supp.2d 638, 648 (D.Md. 2002) ["Reprimands, whether oral or written, do not *per se* significantly affect the terms or conditions of employment."] (citing <u>Nye v. Roberts</u>, 159 F.Supp.2d 207, 213 (D.Md. 2001) <u>vacated and remanded on other grounds</u>, 2002 WL 31163732



28

(4th Cir. 2002)).  As for Plaintiff's "transfer" complaint, this would only constitute an adverse employment action if this conduct denied Plaintiff a material benefit or opportunity for advancement. Cf. Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993)[Finding transfer was not an adverse employment action while holding that "[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"].  Plaintiff has presented no evidence that a transfer would have been a promotion or advancement for him.  Rather, he wanted a transfer because he did not like Smith and the fact that his patient files were being audited.  Plaintiff's Deposition, pp. 102, 132-133, 145-146, 151-154.  See Geisler v. Folsom, 735 F.2d 991, 994-996 (6th Cir. 1984) [no "adverse employment action" where evidence failed to establish any more than bad relations between plaintiff and her supervisor]; cf. Cooper v. Southern California Edison Co., 170 Fed.Appx. 496, 498 (9th Cir. 2006) ["[A]ny potential ridicule and ostracism (plaintiff) suffered was not an adverse employment action."]; Manatt v Bank of America, 339 F.3d 792, 803 (9th Cir. 2003) [Allegations that plaintiff's supervisor stared at her in an angry way and that co-workers were being mean to her were insufficient to show an adverse employment action]; Flaherty v. Gas Research Institute, 31 F.3d 451, 456 (7th Cir. 1994) [a "bruised ego" is not enough].  Therefore, Plaintiff's suspension and termination (which Plaintiff is pursuing as a constructive discharge claim) are the only adverse employment actions addressed in this opinion.[13]

---

[13]Plaintiff also complains that, "long after he left MUHA", Darby filed a complaint against him with the South Carolina Department of Labor, Licensing and Regulation's Board of Nursing, citing to Plaintiff's alleged errors in documenting medications administered to his patients.  See Plaintiff's Exhibit 19.  A review of the SCLLR complaint shows that as part of MUHA's defense of (continued...)



With respect to whether a causal connection exists between Plaintiff's protected activity and the adverse action(s) at issue, considered in the light most favorable to the Plaintiff, the evidence shows that following his complaint to Darby on February 4, 2009 Plaintiff's employee records were (or continued to be) scrutinized by the Defendant, resulting in his being asked to come to Darby's office to meet with Darby and Tom Brown on April 17, 2009. Plaintiff was then questioned about possible drug discrepancies in his records, and asked to submit to a drug test. During this process, Plaintiff again complained about racial discrimination and also that he believed he was being retaliated against. Immediately at the conclusion of this meeting, Darby suspended Plaintiff and had him escorted off the premises. Further, even though Plaintiff was returned to work on April 23, 2009 after his drug test came back negative, by that time Brown had prepared a work report which set forth numerous incidents of alleged misconduct, and Plaintiff was retroactively suspended for the days he had missed because of the findings in Brown's report. Plaintiff then went out on FMLA leave that day, but while he was on leave Plaintiff testified that Smith and Darby had him call in every day, and that Smith and Stacy Simmons would also call him about when he was going to get back to work. Plaintiff further testified that his efforts to obtain a transfer were rebuffed by Slaughter and Frisch, and that Smith thereafter refused to let him return to work.

While Plaintiff has no evidence of any comments or statements by any of the Defendant's managers or personnel from which an inference could be drawn that his complaints

---

[13](...continued)
this lawsuit, it conducted a comprehensive audit of Plaintiff's patient files and found the numerous incidents that are contained in that report. See Bates Stamp No. 416002. While Plaintiff asserts this is evidence of retaliation, Plaintiff has submitted no evidence to show that the events set forth in the SCLLR report did not occur, and upon discovery of this information, MUHA had a statutory requirement to report it to the SCLLR. See S.C.Code Ann. § 40-33-11; see also S.C.Code Ann. § 40-33-190 [Discussing confidential nature of proceeding and documents and immunity from liability]

about possible racial discrimination led to the employment actions taken, the close "temporal proximity" between Plaintiff's protected activity and the adverse employment actions at issue is arguably sufficient in itself to establish this third prong of Plaintiff's prima facie case, at least for purposes of summary judgment. Heady v. US Enrichment Corp., 146 Fed.Appx. 766, 770-771 (6th Cir. 2005) ["[T]emporal proximity is sufficient to meet the low burden required to establish a prima facie case of retaliation in violation of the FMLA...."]; see also Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago, 104 F.3d 1004, 1013 (7th Cir. 1997)[noting that "suspicious timing does constitute circumstantial . . . evidence to support a claim of discrimination"]; Gordon v. Southern Bells, Inc., 67 F.Supp.2d 966, 988 (S.D.Ind. 1999)["A short time span between protected activity and an adverse employment action may be sufficient to prove a causal connection between the two events. . . . A close temporal connection between the two events is generally enough to satisfy the third element of the prima facie case."]; Jones v. City of Elizabeth City, North Carolina, 840 F.Supp. 398, 403 (E.D.N.C. 1996), aff'd., 2 F.3d 1149 (4th Cir. 1993).

Therefore, for purposes of summary judgment and in order to allow for a more comprehensive discussion of Plaintiff's claim, the undersigned has considered the evidence as sufficient to establish Plaintiff's retaliation prima facie case. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) [the burden of establishing a prima facie case is not onerous].

**Legitimate, Non-Discriminatory reason**. With respect to whether the Defendant had a legitimate, nondiscriminatory reason for it actions, the Defendant has presented evidence to show that Plaintiff was suspended for numerous employment problems, including missing medications and the improper administration of medication. See Defendant's Exhibit J. Plaintiff also received formal counseling as well as an oral reprimand for two other employment deficiencies. See Plaintiff's



31

Exhibits L and M. The Defendant's evidence also reflects that Plaintiff was not terminated; rather, he resigned his employment; see Plaintiff's Exhibit 7, Defendant's Exhibit S; and that it had no obligation to rehire the Plaintiff. See Defendant's Exhibits T and U.

This evidence is sufficient for the Defendant to meet its burden of production to show a legitimate, non-discriminatory reason for its actions. See EEOC v. Clay Printing Co., 955 F.2d 936, 941 (4th Cir. 1991) [The Defendant's burden is only one of production, not of persuasion]. Therefore, the Court must turn to the issue of whether sufficient evidence of pretext has been presented for Plaintiff to survive summary judgment on this claim.

**Pretext**. In order to show pretext, Plaintiff must show that "but for" the Defendant's intent to retaliate against him for complaining about racial discrimination, he would not have suffered the adverse job actions at issue. EEOC, 955 F.2d at 941; Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 234 (4th Cir. 1991). Discerning an employer's motives in a case like this is always difficult, as it is the rare employer who is so unwise as to make incriminating statements concerning its motivation so as to provide a plaintiff with concrete evidence to support their claim. Thus, the law provides that evidence derived from circumstances and inferences may be used to support a claim. LeBlanc v. Great American Insurance Co., 6 F.3d 836, 843 (1st Cir. 1993) ["Direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole... must be sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by [retaliatory animus].'"](citing Goldman v. First Nat'l Bank, 985 F.2d 1113, 1117 (1st Cir. 1993)(quoting Connell v. Bank of Boston, 924 F.2d 1169, 1172, n. 3 (1st Cir. 1991), cert. denied, 111 S.Ct. 2828 (1991)); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141-143 (2000). However, after careful review of the arguments and exhibits before the Court, the undersigned finds that Plaintiff has failed

32

to present evidence of pretext sufficient to survive summary judgment on his retaliation claim.

First, Plaintiff himself testified that after he complained to Darby on February 4, 2009 that he was being "disrespected" by some "young white girls" because he was an older black gentleman, no action was taken against him through April 17, 2009 that he attributed to any of the complaints he had made to Darby on February 4, 2009. Plaintiff's Deposition, pp. 157-158. There is also no evidence that Plaintiff having been asked to meet with Darby and Brown on April 17, 2009 was retaliation for Plaintiff's comments to Darby on February 4, 2009, as Plaintiff has presented no evidence to dispute that there were in fact missing drugs and/or a drug "discrepancy" on 9 West, or to show that Smith having requested that Brown investigate the matter was somehow inconsistent with the Defendant's policy concerning such matters. See Defendant's Exhibit V, Section C. Plaintiff has also provided no evidence to dispute that Smith did not single Plaintiff out for investigation, or that she had identified both Plaintiff as well as *another nurse* as being the employees possibly involved. Brown Deposition, pp. 16-17. Nor has Plaintiff provided any evidence to contradict Brown's testimony that when he pulled the records on the other nurse identified by Smith he did not find anything, while with respect to Plaintiff's records, Brown discovered "several errors in there" and "a quantity of drugs missing". Brown Deposition, pp. 17, 19-20. It is hardly surprising under these facts for Darby to have asked Plaintiff to meet with Brown, whose job it was to investigate such matters, and there is certainly no evidence, either direct or indirect, of a retaliatory motive in these facts or to show that the Defendant's conduct was motivated by any retaliatory animus. LeBlanc, 6 F.3d at 843 [To show pretext, the evidence must be sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by a retaliatory animus].

During this meeting with Darby and Brown, Plaintiff commented that he believed he

was being discriminated and/or retaliated against, which is the second time he engaged in protected conduct. Again, however, Plaintiff has presented no evidence to show that his suspension following this meeting pending results of the investigation and his drug test was not consistent with the ordinary practices of the Defendant under such circumstances and in such cases, or that this action was taken because Darby wanted to retaliate against him for complaining about being "disrespected" two months earlier and/or having complained that he thought he was being discriminated or retaliated against as a result of the meeting itself. Cecilino v. Allstate Ins. Co., 908 F.Supp. 519, 532 (N.D.Ill. 1995) [a simple showing that an adverse action occurred after a complaint of discrimination 'is not even enough to make out a prima facie case of retaliation, let alone to survive a motion for summary judgment.']; Wilson v. Noble Drilling Services, Inc., 405 Fed. Appx. 909, 914 (5th Cir. Dec. 23, 2010)[While suspicious timing alone has been recognized as enough to establish a prima facie case, it alone is insufficient to show pretext]. Plaintiff's own speculation that this was the case is not evidence. Gairola, 753 F.2d at 1288, n. 4 [a case should be dismissed "...when the only evidence in support of the plaintiff's...case is based on unfounded conjecture...that [his] disfavorable treatment was the result of discrimination...."].

When Plaintiff's drug test came back negative, he was allowed to return to work on April 23, 2009. However, the evidence shows that Brown had concluded as a result of his investigation that Plaintiff had committed numerous infractions involving missing drugs that the record showed had been removed by Plaintiff but that Plaintiff could not account for, as well as improper administration of medications to a patient, and that although Plaintiff could not offer a reasonable explanation for these discrepancies, Plaintiff had taken no responsibility for the problems identified in the report. Defendant's Exhibit J. Plaintiff has presented no evidence to dispute

34

Brown's findings with respect to the quantities of missing drugs on the dates cited in the report, or to dispute Brown's finding that he [Plaintiff] administered an improper dosage of medication to a patient, again as set forth in Brown's report. Further, Plaintiff has presented no evidence to show that his receiving a three day suspension without pay based on these findings was in any way unusual or contrary to the Defendant's employment policies. See Defendant's Exhibit W, Section E [Policy Governing Disciplinary Action]. There is certainly no evidence that his suspension was because the Defendant wanted to retaliate against him for his statements of February 4, 2009 or April 17, 2009.

While Plaintiff also complains that the additional counseling and/or oral reprimand he received for insubordination as well as for attendance/time-clock work violations was for previous conduct of which the Defendant was aware, essentially arguing that this was some sort of piling on by the Defendant, again Plaintiff has presented no evidence that these employment problems/incidents did not occur, and in any event he received no actionable adverse employment actions as a result of these events. See Defendant's Exhibits L and M; see also Ross, 759 F.2d at 366 ["Title VII serves the laudable goal of protecting employee access to agencies and courts. It does not shield employees from normal sanctions for misconduct."]; Chapman v Geithner, No. _____, 2012 WL 1533514, at * 21 (E.D.Va. April 30, 2012)[Examples of materially adverse actions can include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion"], citing Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999); Koening v. McHugh, No. _____, 2012 WL1021849, at * 5 (W.D.Va. March 26, 2012)[It is the Plaintiff who bears the burden of showing that a reprimand "could potentially [lead] to termination, demotion, decrease in pay, or a similar adverse action"], quoting Newman v. Giant Food, Inc., 187 F.Supp.2d 524, 528 (D.Md. 2002).



35

There is also no evidence that the Defendant planned to take any further employment action against the Plaintiff when he was returned to work on April 23, 2009. Rather, it was Plaintiff himself who then went out on FMLA leave, as he had a right to do, and while he talked to both Slaughter and Frisch about a possible transfer to a different department while he was out on FMLA leave, and testified that Frisch made a racially insensitive comment to him during the course of their conversation, both Slaughter and Frisch responded to Plaintiff's inquiries in writing, and there is nothing in these responses which indicates a retaliatory animus. See Plaintiff's Exhibits 16 and 17. Indeed, it is unknown what Plaintiff's transfer requests at that time would have resulted in, as Plaintiff resigned his position with the Defendant the day after he spoke with Frisch. Plaintiff's Exhibit 7.

Nothing in this evidence gives rise to an inference of pretext in any of the decisions the Defendant made with respect to Plaintiff's employment, or demonstrates a retaliatory animus on the part of the Defendant. While Plaintiff obviously believes he was dealt with unfairly, and indeed the undersigned makes no finding as to whether the discipline meted out to him was appropriate, Plaintiff has simply provided no evidence to support his general and conclusory allegations that the *reason* he was subjected to the adverse employment actions discussed hereinabove was because he engaged in activity protected by Title VII. Sullivan, 197 F.3d at 815 ["Without a showing that those other reasons were discriminatory, [Plaintiff] cannot establish a prima facie case for relief....]. The mere fact that Plaintiff engaged in protected activity does not immunize him from actions by his employer which may otherwise be justified by his work record or performance; Ross, 759 F.2d at 366 ["Title VII serves the laudable goal of protecting employee access to agencies and courts. It does not shield employees from normal sanctions for misconduct."]; Bodoy v. North Arundel Hospital, 945



36

F.Supp. 890, 898 (D.Md. 1996); and while Plaintiff contests that his job performance warranted the actions taken, since he has offered no evidence (other than his own subjective belief and speculation) to show that the actions he complains of were the result of unlawful retaliation, his retaliation claim with respect to these employment actions should be dismissed. Beale, 769 F.2d at 214 [Plaintiff may not "create a genuine issue of fact through mere speculation or the building of one inference upon another"]; see also Kariotis v. Navistar Intern. Transp. Corp., 131 F.3d 672, 680 (7th Cir. 1997) ["Discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination. Thus when an employee is discharged because of an employer's honest mistake, federal anti-discrimination laws offer no protection."]; cf. Rudolph, 884 F.Supp. at 188 ["Title VII (does) not protect against unfair business decisions - only against decisions motivated by unlawful animus"]; Colbert, 677 F.Supp. 2d at 295.

**Constructive Discharge.** Finally, Plaintiff argues that the Defendant's refusal to rehire him is evidence of a retaliatory animus, and that this decision resulted in his constructive discharge from the Defendant's employment. However, even if, for purposes of summary judgment, the Court were to consider Plaintiff's constructive discharge claim as a claimed " adverse employment action",[14] Plaintiff has simply presented no evidence to support his allegation that he

---

[14]But see Hammonds v. Hyundai Motor Manufacturing Alabama, LLC, No. 10-103, 2011 WL 2580168, at * 4 (M.D.Al. June 28, 2011)["So long as the resignation was voluntary . . . there was no constructive discharge and the failure to accept recision of a voluntary resignation is not an adverse employment action"]; Schofield v. Metropolitan Life Ins. Co., No. 03-357, 2006 WL 2660704, at * 8-9 (M.D.Pa. 2006)["An employee who voluntarily resigns cannot show that he or she has suffered an adverse employment decision at the hands of the employer"]; but see, also Rutledge v. SunTrust Bank, No. 05-536, 2007 WL 604966, at * 6 (M.D.Fl. Feb. 22, 2007)[Employee's resignation is not an adverse employment action, absent evidence that it is the product of a constructive discharge"].

was constructively discharged in retaliation for having engaged in protected conduct.

In order to establish a claim for constructive discharge, Plaintiff must have been subjected to employment practices which were both discriminatory and which made his working conditions intolerable, thus forcing him to quit. Garrett v. Hewlett Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002) ["Constructive discharge occurs 'when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign'....The bar is quite high in such cases: a plaintiff must show he had no other choice but to quit."]; Tucovic v. Wal-Mart Stores East, LP, Nos. 09-148 and 10-386, 2013 WL 1287186 at * 7 (N.D.Ind. Mar. 28, 2013)[Finding that standard is higher for showing constructive discharge than hostile environment]; Amaker v. Winn-Dixie, Greenville, Inc., No. 95-1254, 1995 WL 706873, at **1 (4th Cir. December 1, 1995); EEOC v. Federal Reserve Bank of Richmond, 698 F.2d 633, 672 (4th Cir.), rev'd in part on unrelated grounds, 467 U.S. 867 (1984)(emphasis added); see Vitug v. Multistate Tax Comm'n, 88 F.3d 506, 517-518 (7th Cir. 1996); EEOC v. Clay Printing Co., 955 F.2d 936, 946 (4th Cir. 1992); Diamond v. T. Rowe Price Associates, Inc., 852 F.Supp. 372, 397 n. 123 (D.Md. 1994); Bickford v. Denmark Technical College, 479 F.Supp.2d 551, 559 (D.S.C. 2007); Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878, 886 (7th Cir. 1998); Elemore v. Aaron Rents, Inc., No. 07-1328, 2008 WL 4449683 at * 4 (D.S.C. Sept. 30, 2008). To succeed on this claim, Plaintiff must present evidence to show both deliberateness and intolerability. "Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit...." Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985). As for intolerability,

"Intolerability" is not established by showing merely that a reasonable person,

38

confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign....Rather, intolerability is...assessed by the objective standard to whether a reasonable person in the employee's position would have felt compelled to resign.

Blistein v. St. John's College, 74 F.3d 1459, 1468 (4th Cir. 1996), overruled in part on other grounds, Oubre v. Entergy Operations, Inc., 522 U.S. 422, 428 (1998).

The evidence presented is not sufficient to meet this standard. Considered in the light most favorable to the Plaintiff, the evidence is that when Plaintiff was out on leave he was required to call in, and that he also received telephone calls from Smith and Stacy Simmons concerning when he would be coming back to work which "upset [Plaintiff's] whole family". Plaintiff also had the conversation with Frisch in the parking garage, but testified that he had blocked out Frisch's alleged improper comment and did not even remember it because of all the other things that were going on at the time. See Plaintiff's Deposition, pp. 239. Plaintiff then himself resigned his position with the Defendant. Plaintiff has presented no evidence whatsoever to show that Smith, Darby, or anyone else in the Defendant's management was seeking to have him dismissed prior to that day, and has therefore failed to show deliberateness. Bristow, 770 F.2d at 1255.

Further, Plaintiff's testimony that Smith and Simmons had been harsh to him on the telephone, and that the Defendant was refusing to approve his transfer, as well as that he was distressed over having been suspended and accused of all of the employment deficiencies found by Brown in his report and otherwise, is simply not sufficient evidence to create a genuine issue of fact as to whether Plaintiff's working conditions were so intolerable that a reasonable person in his position would have felt compelled to resign. See Matvia v. Bald Head Island Mgmt., 259 F.3d 261, 273 (4th Cir. 2001) [Denying a claim for constructive discharge and noting that "co-worker ostracism



39

[and] denial of management position...would not have compelled the reasonable person to resign. These incidents might have made the workplace less enjoyable for the reasonable person, but not intolerable."]; Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994) ["Dissatisfaction with work assignments, feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."]; Drake, 134 F.3d at 886 ["More than ordinary discrimination is necessary to establish a constructive discharge claim; in the 'ordinary' case, an employee is expected to remain employed while seeking redress"]; see also Bolden v. PRC, Inc., 43 F.3d 545, 552 (10th Cir. 1994), cert. denied, 516 U.S. 826 (1995); Burlington Northern and Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006) [Courts are not here to protect against "slights, minor annoyances, and simple lack of good manners"].

Therefore, Plaintiff's claim that he was constructively discharged from his employment in retaliation for having complained about alleged discrimination is without merit, and should be dismissed. Jones v. Butler Metropolitan Housing Authority, 40 F.Appx. 131, 137 (6th Cir. 2002)[Employer is under no obligation to allow an employee to rescind resignation]; cf. Smith v. Detar Hospital, LLC, No. 10-83, 2012 WL 2871673 * 13 and 18 (S.D.Tx. July 11, 2012)[Concluding Plaintiff's resignation barred her retaliatory termination claim].

## Conclusion

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment be **granted**, and that this case be **dismissed**.



The parties are referred to the Notice Page attached hereto.

Bristow Marchant
United States Magistrate Judge

June 10, 2013
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

